OWEN LINSDAY, Plaintiff in Error, v. THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

> 63  143
> 109  354
>
> 63  143
> 150  353

An accomplice is, in all cases, a competent witness for the prosecution on the trial of a criminal action.

It is in the discretion of the court to determine whether he shall be permitted to become a witness, and the exercise of this discretion is not reviewable upon error.

His competency is not affected by the question as to the extent of his own criminality, i. e., as to whether he was more or less guilty than the accused; this simply goes to his credit with the jury.

If jointly indicted with the accused the court, at the request of the prosecuting officer, may, in its discretion, direct a *nolle prosequi* to be entered so that the accomplice may become a witness.

There is no practice in this State requiring a previous application or a formal order of the court to permit an accomplice to become a witness.

The rule requiring evidence corroborative of that of an accomplice is one of practice, not of law; a jury may convict upon his uncorroborated testimony.

Testimony offered in corroboration is not incompetent because it does not point directly to the prisoner; it is sufficient if it corroborate any part of the material statements in the evidence of the accomplice.

Upon the trial of an indictment for murder it appeared that the body of C., the murdered man, was found, with the skull fractured, in the river S. six months after his disappearance; a medical witness, after testifying as to the appearance of the edges of the fractured bones and to his ability to determine whether the fracture was old or recent, was permitted to testify, under objection, that the fracture was not recently made. *Held*, no error; that the fact that the fracture was not a recent one was pertinent to the issue, and the opinion of one competent to give it was the best evidence of which the fact was susceptible.

To identify the body found as that of C., evidence of similarity in the color of the hair and whiskers, of correspondence in the measure of

the body and the stature of C., and, of the dentist who had extracted teeth for him, of the absence of the same teeth from the jaw of the body found and of similar marks upon others remaining to those he had noticed upon the teeth of C., were received under objection. *Held,* competent.

V., an accomplice, testified that the body of C. was, on a certain night, carried to the river from the barn of the prisoner's father in the prisoner's sleigh which he had brought there with his team for that purpose.     Evidence was received under objection, that the prisoner was seen passing with his team, in the direction from his house to that of his father's, on the night stated by V.     *Held,* no error ; that the evidence was competent as tending to confirm the witness V. as to a material fact; also, that it was not error in allowing the witnesses to fix the date of the passing of the accused with his team by other events the precise time of the happening of which was known.

A witness was asked as to the conduct of the accused about the time of the alleged murder; this was objected to, objection overruled and exception taken; the answer given was held by the court to be wholly immaterial and was at once stricken out and the jury directed to disregard it. *Held,* no error; that the exception was to the question which was competent, as it called simply for the acts and declarations of the accused.

Proof of finding, six months after the alleged murder, blood on timbers and boards of the barn, where according to the testimony of V. the body had been, was held competent as tending to corroborate V.     So far as the lapse of time detracted from the force of the evidence, it was for the consideration of the jury.

After evidence had been given tending to identify certain boards as those taken from the prisoner's sleigh, and that spots, caused by the flow of blood from the dead body, had been on them since the night of the alleged removal, there being no evidence that they had been tampered with since that time or were in any different condition, save that hogs had been dressed upon them, evidence of an expert was offered and received as to certain experiments determining that the spots upon the board were some of them human and some hog's blood. *Held,* no error; and that the facts that the boards had been a long time out of the possession of the prisoner and had been used by other people, while they affected the question as to the identity of the boards and of the blood spots, did not render such evidence inadmissible.

Evidence that C. carried two watches a short time before the murder, with evidence that one of the watches was seen once in the prisoner's possession a few months after, *held,* proper; that the lapse of time between the two events did not render the evidence incompetent, but went to its cogency as proof of guilt.

There is no rule prescribing a time beyond which the possession of property stolen or taken from a murdered man ceases to be evidence of guilt.

The wife of V. was permitted to testify, under objection, that he was absent from home until a late hour on the night when, as he testified, the body was removed. *Held,* no error, as it tended to corroborate V. in a material fact.

By direction of the court, in the course of the trial, one of the witnesses of the accused was committed for perjury. *Held,* that this was not error of which the accused could complain as it was no part of the trial and had no proper place in a bill of exceptions; that if improper, and to the prejudice of the accused, his remedy was by motion for a new trial.

(Argued October 6, 1875; decided November 9, 1875.)

ERROR to the General Term of the Supreme Court in the fourth judicial department to review judgment, affirming judgment of the Court of Oyer and Terminer, in and for the county of Onondaga, convicting plaintiff in error of the crime of murder in the first degree. (Reported below, 5 Hun, 104.)

Plaintiff in error and one Bishop Vader were indicted for the murder of Francis A. Colvin, charged to have been committed on the 19th December, 1873. Plaintiff in error was tried separately.

A body, identified as that of the alleged murdered man, was discovered in the Seneca river June 22d, 1874. The skull was found fractured. One Dr. Kimball, who saw the body soon after its discovery, was called as a witness for the prosecution. He testified to its appearance, the appearance of the edges of the fractured bone and the difference in color of a bone freshly fractured and where the fracture was old. After testifying to his ability to tell whether a fracture was old or recent, he was asked whether the fracture of the bones of the skull of the deceased, as taken from the river, was old or recent. This was objected to on the ground that the opinion of the witness was not competent. The objection was overruled and exception taken. The witness answered that it was not recent.

To identify the body found as that of Colvin, witnesses were allowed to testify, under objection and exception, as to a similarity in the color of the hair and beard of the body and of Colvin, and as to the measure of the body and the stature of Colvin, showing a correspondence. A dentist who had

extracted some teeth for Colvin and who had noticed some peculiar indentations in the others, was permitted to testify that the teeth extracted were missing from the jaw of the body found and that the remaining teeth had the same peculiarities he had specified.

Vader was called as a witness for the prosecution. The counsel for plaintiff in error objected to his competency as a witness: First, that he was a party to the record and that the rule allowing accomplices being sworn did not apply, as he was a principal, or at least equally guilty with the prisoner. The district attorney thereupon moved that a *nolle prosequi* be entered as to Vader, which motion was granted, which order being entered, the objections were overruled, and Vader was allowed to be sworn and examined, to which the counsel for the prisoner duly excepted.

Vader testified, in substance, that the murder was committed by the accused on the morning of December nineteenth, at the barn of Daniel Linsday, father of the accused, he striking Colvin on the head with an ax; that the body was taken up stairs, by witness and the accused, into the hay loft and hidden in the hay; that a large amount of money found on the murdered man was taken and divided as were also some securities, including two mortgages which witness took. Two silver watches were also found, of these the witness took one and the prisoner the other. The prisoner lived about a mile from his father's house. About ten o'clock in the evening he came to his father's with his team and sleigh, the body of the murdered man was placed therein by him and witness, taken to the Seneca river, stones fastened to it and it was sunk in the middle of the river. The boards of the sleigh were stained with blood from the body.

Evidence of several witnesses was offered, and received under objection and exception, to the effect that on the evening of December nineteenth, between nine and ten P. M., the prisoner was seen, driving in his sleigh, on the road between his own house and that of his father's. Some of the witnesses did not recollect the precise day but fixed the time

with reference to other circumstances and events, the precise time of the happening of which was fixed by other witnesses. Evidence was offered, and received under objection and exception, that after the finding of the body blood stains were found upon the floor of the barn where, according to the testimony of Vader, the murder was committed, and also upon the steps leading up into the hay loft. It appeared that the sleigh was used a day or two after the alleged time of the murder, to dress hogs on. In the spring it was stored in the barn of Thomas Handley, a neighbor of the prisoner. After the discovery of the body and the arrest of the prisoner the boards were examined, the blood stains were found on the under side and the cross piece supporting them was also stained. The boards were removed by an officer who kept them in his possession down to the trial. Chips were cut from the boards of the sleigh and also from the floor of the barn and from the steps upon which were the blood stains. These were sent to Dr. Richardson, of Philadelphia, who testified, under objection and exception, that he subjected them to tests under the microscope and to other tests; that by such tests he could tell with perfect accuracy whether the spots were of human blood or that of animals, and that he found some of the spots human blood and some on the chips taken from the sleigh boards hogs' blood.

One Moore, a witness for the prosecution, was asked if he saw any thing in the conduct of the accused about the time of the alleged murder. This was objected to and objection overruled. The witness answered that the accused smoked quite excessively, more than usual. The court immediately ordered the answer to be stricken out, against the objection of the prisoner's counsel who stated he preferred to have it stand with the exception.

Handley was permitted to testify, under objection, as to how the sleigh was housed and stored.

A witness who arrested the accused was asked as to his appearance at the time. This was objected to and objection overruled. The witness answered that he turned very pale.

Proof was given, under objection, that the deceased carried two silver watches a short time before the murder, and a description of them given, and that a few months after the murder one of them was seen in the prisoner's possession.

The wife of Vader was called as a witness and was allowed to testify, under objection, that on the night of December nineteenth he was absent from home until a late hour.

Upon the trial, at the close of the testimony of a witness called for the defence, the court directed the sheriff to take him into custody for perjury.

The defence claimed that the deceased was alive on the Sunday following the day when, as Vader alleged, he was murdered, and was at the house of one Spore. Evidence was offered on the part of the prosecution, and received under objection, that he was there the Sunday previous.

Further facts appear in the opinion.

*J. C. Hunt* for the plaintiff in error. The court erred in receiving the evidence of Vader, an accomplice of the plaintiff in error. (1 Iowa, 316.) Evidence of the conduct of the accused about the time of the murder was not proper. (*Mundville* v. *Gurnsey*, 51 Barb., 99; *Ray* v. *Smith*, 5 S. C., 702; *Newman* v. *Goddard*, 3 Hun, 70; 19 N. Y., 299, 352; 42 id., 270; 3 Keyes, 499; 15 J. R., 239; 1 Cow., 519; 521.) The prosecution had no right to show, as evidence of guilt, that the accused looked quite pale after his arrest and while in the custody of the officer. (Burrill's Cir. Ev., 150.) It was error to receive evidence as to the blood stains on the boards of the accused's sleigh. (2 W. & S. Med. Jur., part 1, § 682; *Stephens* v. *People*, 4 Park., 396.) The evidence as to the watches of the deceased was improper, being too remote. (56 N. Y., 605, 606; 2 Colby's Cr. L., 196, 197.) It was error to allow the wife of the accomplice to testify that her husband was absent from home until a late hour on the night when he testified the body of the deceased was removed. (Rosc. Cr. Ev., 120, 122, 123; 1 Whart. Cr. L., 789; 1 Phil. Cr. Ev., 117; 1 Gr. Ev., § 381; 2 Colby's Cr. L., 181, 183,

215; 21 Wend., 309; 14 id., 114; 7 C. & P., 168, 270, 272; 6 id., 388, 595; 8 id., 106, 261, 732; 1 M. & M. N. P., 326; 22 Pick., 397; 7 Cox Cr. Cas., 48; *People* v. *Haynes*, 55 Barb., 450; *Upton* v. *State*, 5 Iowa, 465; *State* v. *Howard*, 32 Vt., 380; *Kelsey's Case*, 2 Lewin, 45.)

*Wm. C. Ruger* for the defendants in error. A conviction, based entirely upon the uncorroborated evidence of an accomplice, will not be reversed by the appellate court. (*People* v. *Dyle*, 24 N. Y., 578; *People* v. *Evans*, 40 id., 5; *People* v. *Costello*, 1 Den., 83; *People* v. *Dunn*, 29 N. Y., 523; *People* v. *Whipple*, 9 Cow., 707; *State* v. *Keichler*, 10 S. & W. [Miss.], 205; *State* v. *Stocking*, 7 Porter [Ind.]; *State* v. *Cummings*, 4 Kan., 225; *Com.* v. *Knapp*, 10 Pick., 439; *Rex* v. *Rudd*, Cowp., 335; *People* v. *Shaw*, Ct. App., not reported; 2 Hale P. C., 227 [m. p.]; 4 Bl. Com., 330, 331; *Wixson* v. *People*, 5 Park., 119; *People* v. *Cook*, id., 351.) After evidence has been received, without objection, no exception lies to the refusal by the court to strike it out. (4 Park. Cr., 396; 36 Barb., 585.) If inadmissible evidence is received under objection and afterward struck out by the court, the error is cured. (3 Den., 156; 36 Barb., 191; 4 Park., 396.) It was proper to prove that the accused had in his possession property of the deceased. (35 N. Y., 49; 1 Whart. Am. Cr. L., § 728; Burrill's Cir. Ev., 437, 442; Wills' Cir. Ev., 138.) The order committing one of the witnesses for perjury afforded no ground of error. (3 R. S., § 5, p. 961; *Clayers* v. *Thayers*, 3 Hill, 564.) The evidence as to the appearance of the fracture in the skull of the deceased was properly received. (*People* v. *Gonzales*, 35 N. Y., 62.) The evidence of the dentist was also proper. (Wills' Cir. Ev., 126; *R.* v. *Clews*, 4 C. & P., 221; *Com.* v. *Webster*, 5 Cush., 316; *Webster's Case*, 80–87.) It was not error to admit Vader's wife as a witness to corroborate him. (*Wixson* v. *People*, 5 Park., 120, 127; *Hopkins* v. *People*, 16 N. Y., 344.) The declarations and conduct of a party accused are admissible against him. (Wills' Cir. Ev., 101;

2 Rosc. Cr. Ev., 18; *People* v. *Wentz*, 37 N. Y., 303; 3 Whart. Am. Cr. L. [7th ed.], § 3520; Bur. Cir. Ev., 476, 478; *Com.* v. *Webster*, Bemis, 106, 115, 210, 211.)

ALLEN, J.    The document incorporated in the record, as and for a bill of exceptions, is evidently the joint production of the official stenographer and a compositor in a printing and publishing office of a newspaper; one of the modern self-made " bills of exceptions," by which the labor of eliminating from the record all redundant and irrelevant matter and bringing to light the legal propositions and exceptions, is transferred from the counsel to the court of review.    The record contains much of utterly worthless and irrelevant matter, and many, if not a majority of the questions sought to be presented, and the rulings which it is claimed were made and to which exceptions were taken at the trial, can only be ascertained and spelled out by a wearisome reading of long colloquies, uninteresting and, as reported, not always very intelligible, between counsel and court, and in which it is quite apparent that the reporter has not had a very clear view of the ideas intended to be presented by the learned judge presiding and therefore has not well reported him. Again, many, if not most, of the exceptions appear to have been directed by the learned judge and not taken or even adopted by the counsel.    All these and other difficulties in the examination of the case would have been obviated had the counsel prepared, in proper form, a bill of exceptions to be sealed by the presiding judges of the court.    In a case involving the life of a fellow being we are constrained to overlook all technical defects and want of form in presenting the questions for review, and pass upon every proposition which, upon any fair interpretation of the record, we can see was made or passed upon at the trial.    It is not the best form to set out in a case the evidence by question and answer, for the reason that the statements of a witness are more readily and with less labor appreciated and understood when given in a narrative form than in the form more usually

adopted.   But there is no reason why, this being tolerated, the legal questions, the actual decisions of the court and the point of the exceptions should be left to be spelled out by a reading of long arguments of counsel and badly reported opinions and reasons of judges.   The practice is unsafe to litigants and ought not to be sanctioned.   Upon a deliberate and full examination of the record before us we are satisfied that the trial was carefully conducted by the presiding judge; and that in every decision made and in the submission of the issues to the jury the court was tender of the rights of the accused, and that the leanings were in his favor to the extent of giving him the benefit of every doubt in the mind of the judge in the admission or rejection of evidence.   If this were not a capital case we should content ourselves by an affirmance of the judgment for the reasons assigned by the Supreme Court.   But the earnestness and sincerity of the able counsel by whom the plaintiff in error was represented in this court, as well as the nature of the case, make a reference to the questions upon which counsel relied proper.

The first exception is to the opinion of Dr. Kimball, that the fracture of the bones of the skull of the deceased, as taken from the river, had not been recently made.   The witness had testified to his ability to determine whether the fracture was old or recent, and the objection was not to the competency of the witness, but to the fact sought to be proved.   The condition of the body at the time of its discovery, whether mutilated, or entire and uninjured, decomposed or perfect, and whether the appearances indicated a longer or shorter exposure, and whether injuries or mutilations appearing had been recently made, or were made at some time previous, were all facts pertinent to the issue. The inquiries related to the subject of the investigation, and whether they tended more or less directly to prove the main issue and the cause or time of the death, was not material. The fact that the injuries to the skull had not been made at or immediately before the reclamation of the body from the river could only be proved by the appearance of the fractures

and the opinion of those who saw the skull, and were competent to form an opinion. That was the best evidence of which the fact was susceptible. It certainly was competent as a part of the evidence of the condition of the body at the time of the inquest, and it was competent as tending to prove that possibly the wound was inflicted upon the living subject, and was the cause of death. The appearance of the skull could not be so described as to enable the jury to determine the fact sought to be proved. So far as he could, the witness did describe the particular appearance of the edges of the bone upon which his opinion was predicated, and thus gave the jury the benefit of that appearance, and the accused had the benefit of his claim, that the witness should state the appearance which age or newness would exhibit. Whether the fracture was fresh and recent, or discolored and old, was like many other facts, provable by any witness of common experience and understanding, and did not require an expert. (*People* v. *Gonzalez*, 35 N. Y., 62.)

Evidence of the color of the hair and whiskers of the deceased, the measure of the body found, and of the stature of the deceased, the evidence of the dentist of the extraction of certain teeth of Colvin, and peculiar marks upon those remaining, and the absence of the same teeth from the jaw found, and the presence of the same marks upon the other teeth in the jaw, all tended to identify the body found as that of Colvin, alleged to have been murdered.

The exception to the evidence of Doctor George in answer to the preliminary question, whether he could determine by the appearance and direction of the wound in what manner the blow was delivered was obviated, as it would seem from the colloquy between the court and the respective counsel immediately following that the witness was not allowed to state his opinion in respect to the blow. The question answered was merely preliminary to evidence which was excluded.

It is next objected that Vader, the confessed accomplice in the murder, was not a competent witness for the prosecution.

The objection is made to rest upon the ground that the witness was a principal at least, equally guilty with the accused in the commission of the offence charged. It was in the discretion of the Court of Oyer and Terminer to refuse the application of the district attorney to enter a *nolle prosequi* of the indictment against Vader, and thus deprive The People of his evidence, but the exercise of that discretion is not reviewable upon error. Accomplices may in all cases, by the permission of the court, be used by the government as witnesses in bringing their confederates and associates to punishment, and whether more or less guilty does not affect their competency, but the extent of their guilt, and the nature of their offence go to their credit with the jury. The rule contended for by the counsel for the accused would exclude all guilty parties, except accessories before or after the fact, or those who act under some duress, or by the direction or under the influence of others. An accomplice is one of many equally concerned, or a copartner in the commission of a crime. The term includes all the *particeps criminis*, whether considered in strict legal phraseology as principals or accessories. (1 Russ. on Crimes, 26.) The only case cited by the counsel in support of his position (*Ray* v. *State*, 1 Greene [Iowa], 316), does not sustain him. The court held that a *particeps criminis* was competent against his associate in crime, but, as a matter of precaution, he might not be admitted without an order of the court upon an application showing that there was no other person by whom the offence could be proved, and that the witness was not more guilty than the person on trial, and that his testimony could be substantially corroborated. There is no practice in this State requiring a previous application or a formal order of the court to permit an accomplice to become a witness for the State. An accomplice is, in all cases, a competent witness for the prosecution, but whether in all cases he shall be permitted to become a witness, and thus earn an exemption from punishment which is the implied condition of his turning informer, and declaring the whole truth, is in the discretion of the court and the prosecuting officer.

Although it is not usual to suffer a conviction upon the wholly uncorroborated evidence of an accomplice, and juries are advised not to convict without a confirmation as to the material facts; still, if the jury are fully convinced of the truth of the statements of a witness thus situated, they may convict upon his testimony alone. (*People* v. *Costello*, 1 Denio, 83; *People* v. *Dyle*, 21 N. Y., 578; *Dunn* v. *People*, 29 id., 523.)

The evidence that the plaintiff in error was seen passing in the direction from his own house to that of his father's with his team late in the evening on which Vader had testified that the body of the murdered man was taken from the barn of the prisoner's father to the river, was competent. It tended to confirm the witness as to a material fact stated by him, that the body was carried to the river by the aid of defendant's team and sleigh, which he had brought there and used for that purpose. As said by Judge SMITH, in his opinion in the court below, the evidence was " not inadmissible because it was not, in its particulars, certain, positive, or conclusive, in establishing " the fact of the prisoner's participation in concealing the body. The evidence of the witness first called to this point, and which was specifically objected to, was not incompetent because he could not fix the day of the month. The time was identified and the day fixed by other witnesses. (*People* v. *Larned*, 3 Seld., 445; *People* v. *Gonzalez, supra.*)

The question to the witness Moore as to the conduct of the accused about the time of the alleged murder was not objectionable. The acts and declarations of a party are evidence against him, and whether they tend to fix a crime upon him is for the jury. The evidence given in answer to this question was, in the opinion of the court, wholly immaterial, the fact testified to, as interpreted by the judge, being entirely consistent with innocence and it was at once stricken out and the jury directed to disregard it. It could not have prejudiced the plaintiff in error and it is not analogous to the admission of proof of a fact over an objection, and having a

lodgment in the minds of the jury and a subsequent direction to the jury to disregard it.    Here the fact to be called out in answer to the question was not stated to the court in advance; and when it was stated by the witness it was declared immaterial and incompetent.    The exception was to the question, which was competent.

There was no error in permitting the witness to fix the date of the passing of the accused with his team on the occasion before referred to by other circumstances and events, the precise time of the happening of which was known.    Whether the time was satisfactorily fixed as the nineteenth of December when Vader, the accomplice, testified that he with the defendant and his team removed the body, was for the jury.

The testimony of Handley as to the housing of the sleigh and the manner in which it was stored was important and competent as tracing and identifying the boards, from which the blood was taken, as the same on which the dead body was carried from the barn to the river.

Proof of finding blood on different timbers and boards of the barn after the discovery of the body in June, six months after the alleged murder, was competent as it tended to corroborate Vader as to the manner in which, and the course by which, the body was taken from the place of killing to the hay loft.    So far as lapse of time detracted from the force of the evidence it was for the consideration of the jury.

That the fact that the accused turned pale at the time of his arrest charged with the murder, was at the most but slight, if any, evidence of guilt, did not render proof of the fact incompetent.    Whether it indicated guilt or was merely the disturbance of the physical system, which would be as likely to appear in an innocent as a guilty man, was for the jury, in the light of other circumstances, and the acts and declarations of the accused.    Singly it might not justify an inference of guilt, but it was, nevertheless, admissible that the jury might pass upon its indications.    As remarked in relation to another exception, the question called for his looks and appearance, and for facts and not for an opinion; the witness

was asked if he noticed any thing and what it was, and there was no objection to the particular answer given.

The objection to the evidence of Dr. Richardson as to his treatment of the chips from the boards taken from the sleigh of the accused was properly overruled. The objection was that the boards had been for a long time out of the possession of the prisoner and used by other people. There was some evidence that the boards were in the same condition as when they left the possession of the prisoner; and although the evidence was subject to criticism, and the identity of the boards and that the spots were caused by the flow of blood from the dead body of Colvin, were proper matters for argument; and the circumstance that the facts claimed by the prosecution were not proved beyond all controversy and with entire conclusiveness, did not render the result of Dr. Richardson's experiments inadmissible. The questions of fact, viz., the identity of the board and that the blood spots were on them from the night of the nineteenth December, had to be found by the jury before effect could be given to the evidence of the expert. It is enough that there was evidence tending to prove these facts. There was no evidence that the boards had been tampered with, or were in any different condition or differently stained than when they left the possession of the defendant and as they were the day after the murder, except that hogs had been dressed upon them within a day or two after the alleged murder; and there was evidence, upon which the prosecution relied, that the blood of men and of hogs was distinguishable and that both were upon these boards.

Proof and a description of the watches carried shortly before the murder, by the deceased, followed by evidence that one of the watches was in the possession of the prisoner a few months thereafter, and seen only on a single occasion, was proper. Possession of the fruits of a robbery or of the goods of a murdered man soon after the perpetration of the crime, is, unexplained, very persuasive evidence of the guilt of the one so found in the possession of the goods. The

deceased was proved to have carried the two watches, and was seen to have them in November, and the murder is alleged to have been committed in December, and there was evidence for the jury tending to prove the possession of one of them by the defendant in May following. The lapse of time between the different events proved did not, under the circumstances, render the evidence incompetent, but went to its cogency as proof of guilt. It is impossible to prescribe any definite rule as to the time beyond which a party accused of crime shall not be called upon to account for the possession of property stolen or taken from a murdered man. (Burrill's Cr. Ev., 445 *et seq.*, and cases cited.) The more recent the possession the more cogent the evidence, and the lapse of time weakens the presumption of guilt while other circumstances, such as the manner of keeping or using the article may affect the inference to be drawn from the possession.

There was no objection taken to the wife of Vader, the accomplice, as a witness. There is, therefore, no question as to her competency before us. The exception is to evidence given by her to the effect that her husband was absent from the house until a late hour of the night on which he testified that the prisoner and himself removed the body of the murdered man from the barn where it had been concealed during the day, and sunk it in the river. The evidence related very closely to the main transaction, and so far as the principal witness was concerned, tended directly to connect him with it. Although it concerned only the witness, and not the party on trial, it was of a fact not wholly disconnected with the crime, or immaterial to the investigation. It was a part of the *res gestæ*, and did corroborate the witness in a material fact and was consistent with the entire statement made by him. It was a fact so material to the whole story told by the witness, that had it been proved that he was in the house during the hours mentioned his whole statement would have fallen to the ground, and been proved false. As we have seen, it is competent for the jury to convict upon the uncorroborated testimony of an accomplice, and when corrob-

oration is deemed safe, or even necessary, the rule as to the manner and extent of the corroboration is not definitely settled. Learned judges have differed on the subject. Chief Baron JOY, in his treatise on the Evidence of Accomplices (page 98), after reviewing the cases, says: "The only rule, therefore, which has the appearance of reason to support, is that which I have endeavored to show, has uniformly and without an exception been laid down and acted upon by the English judges, which is, that ' the confirmation ought to be in such and so many parts of the accomplice's narrative as may reasonably satisfy the jury that he is telling truth,' without restricting the confirmation to any particular points, and leaving the effect of such confirmation (which may vary in its effect, according to the nature and circumstances of the particular case) to the consideration of the jury, aided in that consideration by the observations of the judge." In *Rex* v. *Beckett* (1 R. & R. Cr. Cases Reserved, 251) the twelve judges agreed that " an accomplice did not require confirmation as to the person he charged if he was confirmed as to the particulars of his story." This does not, of course, imply that a confirmation as to wholly immaterial matters, for example, as to the place of his birth, his age, his residence, but the detail of the crime and matters connected with it. *People* v. *Davis* (21 Wend., 309) is not inconsistent with the authorities cited. The General Sessions of New York had charged the jury that the witnesses who were accomplices of the prisoner were not to be believed by them, unless confirmed by other credible witnesses, in respect to the facts connecting the prisoner with the possession of the forged bills or with the manufacture of them. Judge NELSON says of these instructions, that " they were as favorable to the prisoner as the most liberal cases on the subject recommend ; certainly more so than can be exacted of the court by the settled rules of evidence." The absence of the witness from his house on the business of concealing the body of the deceased, upon the night in question, was a material part of the narrative, and when it was proved that the prisoner was going at

the time and under the circumstances stated, in the direction of the alleged place of rendezvous, the confirmation of the witness as to his unusual absence from home, was not only a confirmation of a material part of the story, but indirectly tended to connect the accused with the crime.  It being merely a rule of practice, and not of law, that an accomplice should be corroborated to justify a conviction upon his evidence, it is not essential that the confirmation when offered should point directly to the defendant, if it is of any part of the material statements of the witness, the question being in all cases whether the jury under all the evidence will believe the uncorroborated part of the testimony.

The commitment of one of the witnesses for the accused, for perjury, was not error of which the accused can complain.  If it was improper and the prisoner was prejudiced by it with the jury, the remedy was by motion for a new trial.  The arrest occurred during the trial, but was no part of the trial, and does not properly have a place in the bill of exceptions.

The movements of Bishop Vader and the other parties named between the nineteenth and twenty-fifth of December became important in determining precise dates which were necessary to be established, and in reference to which there was a controversy.  These dates were material to the issue, and upon their determination depended very greatly the whole framework of the narrative of Vader, the accomplice, upon whose testimony a conviction was asked.  It follows that the evidence of the presence of different parties at Baldwinsville on the several days mentioned in the record was competent as bearing upon the main issue, and the truth of Vader which was sought to be overthrown by like proof, and it was in reply to such evidence that the testimony objected to was given.

Whether the deceased was at Spore's on one or the other of two Sundays was a material question, the defence having given evidence tending to show that he was there on the Sunday following the day of the alleged murder.  Hence it was material for the prosecution to prove that it was the Sunday

previous, and the evidence offered to establish that fact was competent. The same remark applies to evidence given as to the time when deceased was at the house of Odell.

The objection to the evidence of Baker, tending to show the time when the last load of oats was delivered at Baldwinsville, and that they were paid for two or three days thereafter, was properly overruled for the reason assigned by Judge SMITH in the Supreme Court.

Upon a careful examination of the whole case, and every exception taken at the trial, we have found no error to the prejudice of the plaintiff in error.

The judgment must be affirmed.

All concur; except MILLER, J., not voting.

Judgment affirmed.